I'm Carl Gunn. I'm representing Ms. Orellana. Mr. Schlesinger and I are going to divide our time into seven and a half minute increments, and I'm going to try to reserve one and a half minutes of my time for rebuttal. I do want to talk about some of the trial issues, but I'm going to start with the role and offense issue to make sure that doesn't get timed out. On that issue, this case is very much like the Holden case that reversed a role in defense enhancement. Holden held that telling a co-conspirator how to deposit money was not supervising but facilitating. It also uses an analogy of something that would be just facilitating the defendant giving the co-conspirator directions to his house. Those things are just like what Ms. Orellana did here. She told Mr. Soberano, the cooperating witness, how to deposit the money. That's exactly like what the defendant did in Holden. She gave Mr. Soberano directions on where to take the truck. That's analogous to giving directions to a house that Holden used as another example. Ms. Orellana was basically just another foot soldier conveying information to a different foot soldier. The evidence the government tries to point to doesn't make the case sufficiently different from Holden. First, the government at one point says she decided where to put the drugs in the truck. There's no evidence of that. All she ever did was tell... Did they split the profits equally? It's not. There is no evidence about how much money Ms. Orellana got. We know that there are $267,000 in laundered funds, but presumably, she's not getting all that money. She's getting some percentage or some portion of it. I would guess that a mere launderer who's another foot soldier would not be getting... Based on the record, they spent thousands of dollars, or at least a lot of money, on the cooperator here, was getting $1,500 for each trip. And he did 24 trips, so that's $36,000. He might have done as many as 50 trips, which would be $70,000 or $80,000. I don't think it's at all clear from the record that Ms. Orellana and Mr. Salas got, say, over $100,000. And of course, they're splitting it. They may have gotten much less than that. So I think the record does not come even close to establishing that she got a significantly greater amount of the money than Mr. Soberano. You should also remember, it's not just... I mean, Mr. Soberano is going to get a minor role. At least that's what's being recommended. So Ms. Orellana is going to be distinguished from him just by getting no role adjustment at all. So I don't think the money that she was conveyed into her bank accounts is sufficient to distinguish things here, given the normal role of a launderer. And the evidence we have, remember, about the other people who recruited Mr. Soberano and were the owners of the drugs. We have his testimony about Juan Ramon and Guero and Barraza. They were the ones who recruited him. He never met Ms. Orellana until he was already doing this. They were the ones, when they met to talk about him putting money in bank accounts, they were the ones who did all the talking. All Ms. Orellana said is, you can call me and I'll give you the account information. So there really is not anywhere near enough here, Your Honor, to distinguish Holden from this case. I did want to... If the Court doesn't have any questions about the role issue that it hasn't already asked, I did want to touch on a couple of the trial issues. There's the improper testimony about the law that the agent gave. There's also the improper argument about what I'll call the don't consider punishment instruction. On the don't consider punishment instruction, I think it's pretty plain the prosecutor... When you say don't consider punishment instruction, are you talking about the instruction or are you talking about what the prosecutor said regarding... Well, I'm talking about both, Your Honor, because the prosecutor basically drafted that instruction to support into his argument, is supporting his argument. But those instructions were... Is this the same instruction that the defense stipulated to? Well, there's nothing... There's no problem with the instruction. Yes, Your Honor, but there's no problem with it. Do you agree, Mr. Gunn, if the defense stipulated to this? I mean, I'm not sure how we fault the district court in terms of error with respect to that instruction when it seems like that's been waived by the defense by agreeing to the instruction. I think there's an argument you're trying to make regarding what the prosecutor said regarding that instruction. Is that what you're talking about? Correct. I am not complaining about that instruction itself at all. The problem is the prosecutor claiming... The prosecutor basically used that instruction and said it applies to Mr. Soberano. And that's a big problem because if that instruction... First of all, the Reid case says that instruction does not apply to the cooperating witness. It applies only to the defendant, punishment of the defendant. And when the prosecutor tells the jury that it applies to the cooperating witness, they're basically... He's basically saying you can't consider what's probably the most important motive this cooperating witness has to help the government. Yeah, but we're looking at that issue under plain error review, I believe. And so tell me why that's plain error, especially when there's possibility to interpret that a different way other than what you have just stated. I don't think there really is a way to interpret it a different way, Your Honor. The prosecutor specifically referenced an instruction. He said, quote, the court instructed you the punishment is up to the court, unquote. So it was that instruction he was telling the jury applied to Mr. Soberano. And that instruction said two things. It said the punishment provided by law for the crime is for the court to decide. And second, it said right after that, you may not consider punishment in deciding whether the government has proved its case, unquote. So I think the error is plain, Your Honor. There's obviously also the issue of whether it's prejudicial. I think it's prejudicial here because especially as to the drug trafficking conspiracy, this case basically depended completely on whether the jury believed Mr. Soberano. There was no other evidence at all that Ms. Orellano knew this was drug money or even that she knew it was criminally derived, frankly, but certainly not drug money. You're using all of your time. I'll see if there's time to give you a minute in rebuttal. Mr. Schlesinger? Yes, good morning, Your Honor. May it please the Court, my name is David Schlesinger. I represent Appellant Manuel Salas. I'd first like to briefly expand upon the role issue regarding sentencing before briefly discussing the dual willful blindness jury instruction that the District Court gave. I'd like to try to reserve approximately a minute to a minute and a half for rebuttal, if possible. One point I'd like to additionally make regarding the role is that the District Court clearly erred to the extent it adopted Paragraph 42 of the PSR in determining that Jenny Sarmiento was a participant in the putative scheme. On page, I believe it's 981, ER 981 of Mr. Salas' excerpts of record, Special Agent Gonzales of IRS-CII specifically testified on cross-examination that the government did not have sufficient either distribution purposes or for money laundering conspiracy purposes. So to the extent that the District Court made that finding, it was clear error. And under Holden, it irreparably tainted its role analysis because Holden held that for someone to be deemed a participant for 3B1.1 purposes, the person had to have had criminal participation culpability. So that was an erroneous finding. It taints the entire conclusion regarding both Mr. Salas and Ms. Oriana. This court should therefore vacate the sentences. Regarding the dual instruction, as Mr. Gunn mentioned, I'd like to expand upon it. The government's evidence regarding count one, the distribution conspiracy count, was paper-thin, granted almost entirely on Mr. Soberano's testimony. Mr. Soberano, as this court is aware from reviewing the record, is not a Garden Variety Cooperative witness. He admitted to serial lying. He lied multiple times to federal agents and federal prosecutors in New Mexico when he was interrogated, when he had proffer sessions following his March 2012 arrest. He was deceitful in his personal life. He admitted to trafficking illegal loads in addition to the illegal narcotics that he was trafficking over a period of multiple years. He was arrested on a couple of occasions for other offenses, even though he wasn't convicted. Well, if we continue on, on the juror instruction issue, why hasn't this been waived since it was a joint juror instruction to the court? Well, Your Honor, it is plain error of review. We acknowledge that, but we do not think the issue is entirely waived. It's noted in a number of cases that we've cited, including United States v. Barron, it's still appropriate for this court to consider the Juul or Redia issue in the plain error context. Do you agree that plain error applies to juror instructions? It does, Your Honor, yes, especially in this context. We would cite Barron for that proposition specifically. Barron resulted in a reversal on plain error. There's a forfeiture, but it's not an outright waiver altogether. This court can therefore still consider it in the plain error context. And we think that even under that plain error standard, there is still a reasonable possibility that if the Juul instruction had not been given, that the jury might have acquitted Mr. Salas on count two. And this is because, as I was mentioning earlier, is that the government relied entirely on an actual knowledge theory regarding Mr. Salas' putative culpability in the money laundering conspiracy. And if the jury had rejected Mr. Sobrano's, quite frankly, dubious testimony, given his inherent credibility problems and his incentives to cooperate, I should also mention that he had the possibility of getting safety valve eligibility or a 5K1 letter from the government if he offered what the government had offered. But given the inherent problems regarding Mr. Sobrano and the virtually non-existent documentary evidence regarding Mr. Salas' role in the supposed money laundering conspiracy, we do think that there is a reasonable possibility that the jury, with only an actual knowledge instruction devoid of Juul, might have acquitted Mr. Salas on count two. I do see that my time is diminishing, and I probably don't have sufficient time to transition to another issue. So if there are no further questions from the court, I'd like to reserve  Thank you, Mr. Schlesinger. Mr. Kitchell. Thank you, Your Honor. Good morning, Your Honors, and may it please the court, Aaron Kitchell for the United States, that both defendants or appellants return to the sentencing enhancement first. I'll address that issue first. First, with respect to the nature of the money laundering offense, my opposing counsel mischaracterized the money laundering scheme here a bit. The fact that Ms. Orellana may have only received a percentage or portion of the funds laundered, that would be a pass-through money laundering scheme. But the appellant here established that this was not a pass-through money laundering scheme. Ms. Orellana and Mr. Salas were being paid for their services as transportation coordinators for the drug cartel. So all of the money that was deposited, certainly in the Chicago accounts, appeared to be for Ms. Orellana and Mr. Salas and were used by Ms. Orellana and Mr. Salas. And so they did receive multiple factors of proceeds and payment beyond what Mr. Soberano received. To Holden, what Holden instructed is that other, a defendant organizes other participants if he has, quote, the necessary influence and ability to coordinate their behavior so as to achieve the desired criminal results. The record established that over a series of months, Ms. Orellana and Mr. Salas directed Mr. Soberano on almost each occasion that he transported drugs across the country and then deposited money into accounts, how and when to pick up the drugs, and then how to deposit the accounts, often in a structured manner, into nominee accounts. And there were a series of account options and Ms. Orellana and Mr. Salas directed Mr. Soberano on each one of those occasions on how to deposit the money into the accounts. In addition, when Mr. Soberano failed to deposit the money quickly, the evidence established that Ms. Orellana used Ms. Sarmiento to persuade Mr. Soberano to deposit the funds, which again indicates their respective roles. So I guess I want to make sure I understand you're responding to the argument that somehow the district court committed error by considering Ms. Sarmiento a participant. You're saying she was, that was correct to do so, or she wasn't a participant? I just want to make sure I understand. I actually had not reached that issue yet. Let me turn to that issue. So with respect to Ms. Sarmiento's participation, the government did not say that Ms. Sarmiento was a knowing co-conspirator in this and made clear at the time of sentencing that it was not relying on the direction of Ms. Sarmiento to establish a role enhancement. What happened, what the district court said was that the district court referenced four participants being involved in the scheme, including Ms. Sarmiento, but then at Solace excerpt of record 91 and 92, the district court made clear that it was solely focusing on the direction of Mr. Soberano and how and when to transport narcotics and receive the profits of drug proceeds in order to impose the role enhancement. So the record here is clear that the district court was only looking at the direction of Mr. Soberano in imposing the role enhancement. Unless the court has... But do you agree, do you not, Mr. Kitchell, that Ms. Oriano was probably far more active in directing Mr. Soberano than Mr. Solace? I'm just wondering, did Mr. Solace do a leader role in terms of directing as opposed to facilitating or working with? Can you maybe sharpen that position for the government for me? Yes, Your Honor. With respect to the activity, we can see that Ms. Oriano was more active than Mr. Solace and that was by design because as the testimony made clear, they were trying to insulate Mr. Solace given his role in enforcement. But what we do know is that Ms. Solace, excuse me, Ms. Oriano and Mr. Solace worked very closely together. The toll records indicated that over the period of the relevant time period of this investigation, they were averaging five calls a day with each other. So they were actively coordinating with each other and it was clear that they were using the proceeds together and that they were both benefiting from the proceeds. In addition, we have a text message from Mr. Solace two days, I believe, before Mr. Soberano was arrested with the final drug load directing Mr. Soberano where to deposit the funds that he would pick up in Chicago related to that load. And what Mr. Solace did was he used coded language to provide those instructions. He told Mr. Soberano to deposit the money in the account ending in zero. What the evidence showed, however, was that there were two accounts ending in zero. One was Ms. Sarmiento's account and the other one was an account with Ms. Oriana. So in order for Mr. Solace to be able to use coded language to effectively direct Mr. Soberano, we argued, and I think it was a fair inference, that Mr. Solace had done this on prior occasions and that there was a common understanding between Mr. Solace and Mr. Soberano regarding how he was directing him to deposit the funds into those accounts. That alone, we think, given the nature of the conspiracy, would be sufficient for a role enhancement. But in addition, we also have Mr. Soberano's testimony, which not only did the jury appear to credit, but Judge Carney also appeared to credit in the sentencing. And what he said and what Mr. Soberano testified to was that Mr. Solace, as he became more comfortable with Mr. Soberano, directed Mr. Soberano at times of how to pick up the drugs and how to deposit the funds. And in addition, at the time, at the last drug load, which Mr. Solace told Mr. Soberano would be the largest drug load that they had sent across country so far, Mr. Soberano expressed concern about doing this and expressed doubt. And that is corroborated in some of the text messages that were introduced at trial. And Mr. Soberano testified that Mr. Solace mollified him and told him, don't worry about it, get this done. That's the type of respective roles that we think justifies a role enhancement. And the court, we don't believe in finding that there was that dynamic between the two of them. We believe that that would be reviewed for clear error. And we don't think that that was a clear error for the district court to make that finding. Unless there's other questions about the sentencing, I'll turn to the two other issues that my colleagues raised. One was with respect to the jewel instruction. Let me address that first. With respect to the jewel instruction, there can be no showing of substantial harm here because one, the government never relied on a deliberate ignorance argument in its closing argument. It only reviewed on actual knowledge, relied on actual knowledge. And the jury here convicted the defendants of the drug conspiracy, which required actual knowledge. And so the jury here found that the defendants had actual knowledge, which necessarily means that they knew that the proceeds of the laundered funds were, excuse me, it was drug proceeds that they were laundering. And so they had actual knowledge of both, and there can be no substantial harm from the jury instruction regarding jewel. With respect to the argument made in rebuttal, you know, I believe that what this is, Your Honor, is an isolated phrase that is taken out of context and was mischaracterized on appeal. What the government consistently said during the course of the trial was that the jury had to consider Mr. Soberano's credibility and that it should evaluate Mr. Soberano's testimony with caution. Under recognition of Mr. Soberano, the government elicited from Mr. Soberano that he hoped to receive a reduced sentence, and that's at 597. The jury then told the jury that Mr. Soberano hoped to receive favorable consideration from the government. That's at 1113. In its argument, the government emphasized that it was the jury's role to evaluate Mr. Soberano's credibility. That's at 1155. And in rebuttal, the government attorney said that Mr. Soberano's testimony should be considered with caution, and that's at 1257. The government never vouched for Mr. Soberano, nor did it indicate that Mr. Soberano's credibility was unimpeachable. The phrase that is being litigated here came about when the government attorney on rebuttal said that the jurors should not speculate about the particular sentence that Mr. Soberano would receive came up extensively on cross-examination, and that was at Excerpt of Records 692-96. And both counsel argued about his reduced sentence, about the potential for his reduced sentence in closing. In rebuttal, the government attorney said there was a lot of speculation about what the impact of the plea agreement would be, but then noted that the jury should not speculate on what the specific sentence should be. The clear understanding of that phrase in the courtroom was that it was instructing the jury not to speculate about a particular sentence, and that was why there was no objection at the time. The probability that the jury understood from that phrase that they could not consider the sentencing benefit that Mr. Soberano may receive. And so, Judge Murguia indicated there is a potential different interpretation than the appellant's pose, and based on that, we don't believe that the court here could find that the district court plainly erred in permitting that argument to be made. Unless the court has any additional questions, I'm prepared to submit. Judge Corman? Judge Lee? Thank you. Thank you, Your Honors. Mr. Gunn, I'll give you one minute. Thank you, Your Honor. I'd like to make three or four quick points in response to the idea that Ms. Soriano and Mr. Salas were being paid for coordinating transportation. First of all, there's no evidence in the record, I believe, that they were getting all that money, so that is not something that's clear at all from the record. Second, and most I would suggest, that implies they shouldn't get the minor rule adjustment that Mr. Soberano is apparently going to get without giving them the aggravated rule adjustment and not getting the minor rules of four-level swing that adds like seven to eight years to their range. Third, their profit was certainly far less than what other people were getting out of this. We're talking about millions of dollars worth of drugs, and even if they got all that money, we're talking about a couple hundred thousand dollars. So compared to all the participants, which is what you've got to compare to, not just Mr. Soberano, they certainly don't rise to the level of organizers. One last point, if the court will let me make it, I'm over time. The problem with the instruction, the government's argument, is not just that they made this, it's not just an isolated phrase. They basically enlisted a court instruction on their side, and that court instruction said, among other things, don't consider punishment. I'll submit unless the court has questions. Mr. Schlesinger. Thank you, Your Honor. I have a few brief points I'd like to make first, beginning with the role issue. In response to what Mr. Ketchell said about the district court's particular findings during the sentencing hearing, I'd refer the court again to ER 91 and 92, as Mr. Ketchell did, and I'd read a little bit from his brief in-court statement. He said, as paragraph 42 of the revised pre-sentence investigation report states, there were at least four known participants in the drug distribution activity. Mr. Salas, Ms. Oriana, Mr. Soberano, and Ms. Sarmiento. So he did make an explicit finding regarding Ms. Sarmiento's punitive role as a participant that was clearly erroneous, even though the district court then went on in the next sentence to compare or discuss Mr. Salas's supposed control and direction over Mr. Soberano. That overall analysis is still tainted because of Ms. Sarmiento's improper presence in it. So at a bare minimum, there should be a new sentencing hearing so that the district court should consider role without Ms. Sarmiento being part of the case. Mr. Salas's having supposedly directed, or I should say, having given instructions to Mr. Soberano on one occasion regarding a bank account, that is squarely within the purview of what Holden said is not the type of control or organizational authority necessary to qualify as a 3B1.1 role. In that case, as the court is aware, it also concerns financial transactions like this. So that is not sufficient for 3B1.1 purposes. And to the extent that Mr. Ketchel is trying to infer that there were other such instances, simply put, there wasn't any actual documentary evidence submitted of other such occasions in which Mr. Salas conveyed account related information to Mr. Soberano. I see that my time has expired. I would like to make a brief point regarding JUUL if the court is willing to hear it. If not, I'd be pleased to submit. Go ahead. Thank you, Your Honor. I'll be very brief. Regarding the JUUL instruction, Mr. Ketchel did mention, of course, that Mr. Salas was convicted on count one. I do know, however, that the government's own expert regarding drug organizations, drug distribution organizations, Special Agent Etheridge of the DEA, testified that there is extreme compartmentalization that exists in organizations such as the one that typically occurs here. So it's quite plausible that even accepting the jury's verdict that Mr. Salas had culpability for count one, the distribution count, he might very well still have not known anything about the money laundering scheme that was going on. And as Judge Murgia pointed out correctly, there's much less evidence of Mr. Salas' role in the supposed money laundering as opposed to Missouriana. So in that regard, the conviction alone on count one is not sufficient to justify the JUUL instruction for count two. I thank you, Your Honors, for allowing me to go over time. If there are no further questions, I'd be pleased to submit. I don't think anybody else has any questions, so I want to thank you all, Mr. Ketchel, Mr. Gunn, Mr. Klesinger, for your oral argument presentations today. The case of United States of America versus Saida Oriana and Manuel Salas is now submitted. Thank you.
judges: Murguia, Korman, Lee